**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**NOT FOR PUBLICATION**

JEROME DIGIOVANNI,

        Plaintiff,

v.

ALFARO ORTIZ, et al.,

        Defendants.

Civ. Action No. 05-2306 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

**I. INTRODUCTION[1]**

    A fight had broken out. The inmates eating breakfast in the mess hall, scrambled to get out of the way of the swinging fists and sharp elbows. Prison officials responded by activating the riot bell, assembling two response teams, and shouting commands to the two brawlers, inmates Michael Manoil ("Manoil") and Jason Berardi ("Berardi"). One team positioned itself just outside one of the sally ports that feed into the mess hall. Realizing that his team could not pass through the entryway because the inmates were crowded there, Captain Frank Pascucci ("Pascucci") ordered the inmates who had retreated into the sally port to return to the mess hall and stand away from the fight. One of the inmates, Jerome DiGiovanni ("DiGiovanni"), stood on the opposite side of the room, away from the altercation. Manoil and Berardi stopped fighting. Then, Manoil sauntered over to DiGiovanni and, without warning, punched him in the jaw.

---

[1] The facts recounted in the introduction are taken from the Declaration of Frank Pascucci (Pascucci Decl., docket entry # 72-4) and video footage of the incident (Surveillance Footage, Ex. J to Johnson Decl.).

This case concerns whether DiGiovanni's constitutional rights were violated by prison officials before, during, and after the fight in the mess hall that morning.

## II. BACKGROUND

At all relevant times, DiGiovanni was incarcerated at East Jersey State Prison ("EJSP") in Rahway, New Jersey. On January 23, 2005, at approximately 7:40 a.m., Sergeant Howard Meyer and Senior Corrections Officer ("SCO") J. Ventura, EJSP employees, observed Manoil and Berardi fighting in the mess hall and activated the riot bell. (Surveillance Footage, Ex. J to Johnson Decl.) DiGiovanni had already finished eating and was waiting in the sally port, along with other inmates, for corrections officers to transport him to his housing unit. (DiGiovanni Dep. 9:19-9:22, Ex. B to Scott Decl., docket entry # 72-5.)

Official EJSP emergency procedures provide that a staff member must seek emergency assistance by activating the riot bell when s/he observes an incident which is or may result in a violent altercation. (Ex. G to Johnson Decl. CD DOC 037.1 and 037.2.) The officers responding to the riot bell serve as the initial response team, which must consist of twelve officers and one supervisor. (Ex. G to Johnson Decl. CD DOC 039-040.) Those officers responding to an incident in the mess hall must carry batons and wear protective gear. (Ex. G to Johnson Decl. CD DOC 039-040.) Once assembled, the team supervisor assesses the situation in order to decide whether to enter the area to control the disturbance. (Ex. G to Johnson Decl. CD DOC 040.) A secondary response team is assembled, consisting of six officers and one supervisor, who are also equipped with protective gear and batons. (Ex. G to Johnson Decl. CD DOC 040.)

Captain Pascucci responded to the riot bell in the mess hall that morning and assembled the initial twelve-officer response team. (Pascucci Decl. ¶¶ 8-9.) Because the

2

team would need to go through the sally port to get into mess hall, he ordered the inmates who had been waiting in the modular sally port to return to the mess hall and stand away from the altercation. (Pascucci Decl. ¶ 14.) After approximately two minutes, Manoil and Berardi heeded the instructions from corrections officers to "break it up" and separated, with Manoil walking over to the side of the mess hall where DiGiovani was standing. (Surveillance Footage, Ex. J to Johnson Decl.) With the fight over, Captain Pascucci determined that it was no longer necessary for the response team to go into the mess hall. He instructed Manoil and Berardi to leave the mess hall through the modular sally port to be taken into custody. (Pascucci Decl. ¶¶ 14 and 17.) It was then that Manoil walked over to where DiGiovanni was standing, and, without warning, punched DiGiovanni in the jaw. (Surveillance Footage, Ex. J to Johnson Decl; Pascucci Decl. ¶ 18.)

The following day, Senior Investigator Gerry Aponte interviewed DiGiovanni and Manoil regarding the incident. (Ex. F to Johnson Decl. DOC 078.) DiGiovanni stated that he had no idea why Manoil punched him. Manoil said that he attacked DiGiovanni just because he looked like Berardi. (Ex. F to Johnson Decl. DOC 079.) Investigator Aponte issued a report recommending that prison officials take the protective steps of separating DiGiovanni and Manoil and housing DiGiovanni in a single cell. (Ex. F to Johnson Decl. DOC 079.)

Correctional Medical Services, Inc. ("CMS") has contracted with the New Jersey Department of Corrections ("DOC") to provide medical services for the inmates housed in NJ DOC facilities, including EJSP. (Am. Compl. ¶ 10, docket entry # 46.) At approximately 8 a.m. on the day of the incident, DiGiovanni was taken to the medical unit, which is staffed by CMS personnel, and evaluated by Registered Nurse Sharin Baldassano, who noted that

he was alert, responsive and walking with stable independent balance. (Ex. H to Johnson Decl. EMR1-EMR2.) She concluded that he did not sustain severe injuries from the blow because there was no evidence of swelling or erythema, his teeth were intact, and he had full movement of his jaw without difficulty or limitation of range of motion. (Ex. H to Johnson Decl. EMR2.) She noted that although there was no tissue injury, there was a small area of inflamed tissue at the back of his throat. (Ex. H to Johnson Decl. EMR2.) She advised him to gargle with warm salted water and increase his fluid intake. (Ex. H to Johnson Decl. EMR2.) Later that same day, DiGiovanni complained of coughing, difficulty breathing, and a sore throat. (Ex. H to Johnson Decl. EMR4-EMR6.) Nurse Baldassano, deciding that he was suffering from the common cold, gave him anti-inflammatory pain medication and told him she would bring more with the morning medication rounds. (Ex. H to Johnson Decl. EMR1-EMR2.)

On January 24, 2005, at approximately 11:30 p.m., Nurse Baldassano again examined DiGiovanni, who was complaining of jaw pain and an inability to eat whole foods. (Ex. H to Johnson Decl. EMR8-EMR11.) He told her that his jaw pain had worsened and that he had not been able to eat since the incident. (Ex. H to Johnson Decl. EMR9.) Nurse Baldassano found that his lower jaw showed no signs of bruising or discoloration, there was no inside tissue injury, his teeth were intact, and there was no active drainage. (Ex. H to Johnson Decl. EMR9.) She noted that although there was some swelling, he was able to open his mouth wide for her examination without pain or difficulty and suffered no limitation in range of motion. (Ex. H to Johnson Decl. EMR9.) When he asked to be housed in the medical unit, she told him that there was no acute need for a transfer. (Ex. H to Johnson Decl. EMR9.) Nurse Baldassano continued the existing course of treatment, anti-

inflammatory pain medication, and scheduled an appointment for him with Dr. Elmira Kapchits for the following morning, January 25, 2005. (Ex. H to Johnson Decl. EMR10.)

Dr. Kapchits was unable to see DiGiovanni on January 25th. But on January 26, 2005 at approximately 6:30 p.m., he was examined by Registered Nurse Carolyn Rubin, again for his complaints of jaw pain and an inability to eat. (Ex. H to Johnson Decl. EMR12.) Nurse Rubin noted that the right side of his jaw was noticeably swollen and placed him on the exception list so that he could be examined by a doctor the following morning. (Ex. H to Johnson Decl. EMR12.)

On January 27, 2005, Dr. Kapchits examined DiGiovanni, who was still complaining of pain in his jaw. (Ex. H to Johnson Decl. EMR12-EMR13.) She prescribed him Naprosyn for the pain, ordered a soft foods diet, referred him for an x-ray, and advised him that he would need a follow-up appointment. (Ex. H to Johnson Decl. EMR13-EMR14.) The x-ray of his jaw was performed on February 1, 2005. (Ex. H to Johnson Decl. EMR13-14.) EJSP received the results on February 3, 2005, which revealed a displaced and overlapping fracture of his right jaw bone. (Ex. I and Ex. H to Johnson Decl. EMR17.) Dr. Kapchits scheduled an appointment with an oral surgeon and admitted DiGiovanni to the prison infirmary to begin antibiotic treatment and a liquid diet. (Ex. H to Johnson Decl. EMR17-EMR20.)

On February 4, 2005, Dr. Sager, an oral surgeon, evaluated DiGiovanni and recommended a follow-up appointment two weeks later to assess the need for surgery. (Ex. H to Johnson Decl. EMR27.) When he returned to EJSP, DiGiovanni requested, and was granted, a discharge from the infirmary. (Ex. H to Johnson Decl. EMR27.) Dr. Kapchits examined him again on February 7, 2005 and placed him on a soft foods diet. (Ex. H to

5

Johnson Decl. EMR30.)  On February 21, 2005, Dr. Jon Hershkowitz evaluated DiGiovanni and prescribed him pain medication.  (Ex. H to Johnson Decl. EMR31-33.)  A few days later, on February 25, 2005, he had his follow-up appointment with Dr. Sager, who decided to schedule another follow-up appointment for four to six weeks later.  (Ex. H to Johnson Decl. EMR35.)

On March 14, 2005, Dr. Hershkowitz reissued DiGiovanni's prescription for a specialized diet after he complained to the infirmary staff that he was not receiving his specialized diet and meal replacement beverages.  (Ex. H to Johnson Decl. EMR38-EMR39.)  On March 22, 2005, DiGiovanni told the infirmary staff that he felt better and wanted a regular diet, which Dr. Hershkowitz approved.  (Ex. H to Johnson Decl. EMR40-EMR42.)  On March 24, 2005, after informing the medical staff that he no longer experienced jaw pain, he was treated for his jaw for the last time by Dr. Sager and Dr. John Hochberg.  (Ex. H to Johnson Decl. EMR43-EMR62.)  On April 29, 2005, DiGiovanni filed this suit *pro se* alleging that various defendants at EJSP are liable under 42 U.S.C. § 1983 for violating his Eighth Amendment rights.  He was released from EJSP on September 8, 2005.  (Ex. A to Johnson Decl.)

On September 7, 2006, DiGiovanni, having obtained representation by counsel, amended his Complaint to join as defendants Commissioner Brown, Nurse Baldasanno, SCO Mikulak, Sgt. Meyer, SCO Ventura, and unnamed CMS employees.  Count One of the Amended Complaint seeks damages against Captain Pascucci, Sgt. Meyer and SCO Ventura for acting with deliberate indifference to a foreseeable and identifiable known risk of injury.  (Am. Compl. ¶ 43.)  Count Two of the Amended Complaint seeks damages against Nurse Baldassano, SCO Mikulak, and several unnamed CMS employees based on the

6

allegation that they were deliberately indifferent to DiGiovanni's medical needs during the course of treatment for his injuries. (Am. Compl. ¶ 51.) Count Three of the Amended Complaint seeks damages against Devon Brown, then Commissioner of the DOC, and Alfaro Ortiz, an EJSP Administrator, for failing to "adequately train and supervise correctional personnel, both corrections officers and CMS employees, in the protocols to be followed in the face of an incident of significant trauma followed by subjective complaints of pain." (Am. Compl. ¶ 58.) Count Four of the Amended Complaint seeks compensatory and punitive damages against Brown, Ortiz, CMS, and two unnamed CMS employees for an alleged implied policy of limiting inmate access to diagnostic tools, including x-rays. (Am. Compl. ¶ 61-63.) Count Five of the Amended Complaint is a state law negligence claim against CMS, Nurse Baldassano and two unnamed CMS employees.

Currently before the Court are the defendants' two summary judgment motions, which seek dismissal of all counts of the Amended Complaint.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes a court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the party seeking summary judgment to prove that there are no genuine disputes of material fact. McCarthy v. Recordex Service, Inc., 80 F.3d 842, 847 (3d Cir. 1996). "The burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."

7

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986). Unsubstantiated arguments made in briefs do not constitute evidence and will not defeat a motion for summary judgment. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

**B. Deliberate Indifference to a Foreseeable and Identifiable Known Risk of Injury**

Defendants move for summary judgment on Count One, which seeks to impose liability upon Captain Pascucci, Sgt. Meyer and SCO Ventura for acting with deliberate indifference to a foreseeable and identifiable known risk of injury. They assert that the record shows that Pascucci, Meyer, and Ventura "acted reasonably, and in accordance with the standard policy, in response to an emergency situation in an effort to maintain the safety and security of the institution." (Def.'s Summ. J. Br. 23.) DiGiovanni contends that the defendants placed him in harm's way when they ordered him to reenter the dining hall with a violent incident still taking place there, and that they then "failed to take the obviously prudent steps necessary to protect plaintiff from injury." (Am. Compl. ¶ 43.)

"A prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment," giving rise to a cause of action under 42 U.S.C. § 1983. Farmer v. Brennan, 511 U.S. 825, 828 (1994). However, a prison official will not be deemed liable if s/he responded reasonably to the risk, even if the harm ultimately was not averted. Id. at 844. The Eighth Amendment imposes on a prison official the duty to ensure reasonable safety, not a general duty to protect inmates from injury. Helling v. McKinney, 509 U.S. 25, 32 (1993). "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). "Whether one puts it in terms of duty or

deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 844-845.

DiGiovanni bases him claim on the alleged inadequacy and unreasonableness of the officer response to the incident. He contends that "The fight began and ended without staff presence and no indication other than Pascucci's statement (that the absence of enforcement was due to the fact that a squad was being assembled) of any reason for the lack of activity." (Pl.'s Opp'n Br. Summ. J. 10.) DiGiovanni contends that the prison officials did not do enough in responding to the incident in the mess hall, but the surveillance footage of the incident and his own representations tell a different story.

In Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), the Supreme Court held that:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment… The Court of Appeals…should have viewed the facts in the light depicted by the videotape.

Here, as in Scott, video footage of the events at issue undermines the plaintiff's version of the facts. Contrary to DiGiovanni's characterization of the official response as deficient, surveillance footage establishes that the response was immediate and continuous. The riot bell can be heard going off mere seconds after the fight began and officers can be heard from the direction of the sally port yelling commands at Manoil and Berardi to stop fighting. (Surveillance Footage, Ex. J to Johnson Decl.) And the absence of staff presence cited by DiGiovanni to demonstrate the inadequacy of the response is reasonably attributable to the brevity of the altercation, which the surveillance video shows was over in approximately two minutes.

9

DiGovanni also asserts that Captain Pascucci's explanation that a squad was assembling near the sally port is "a thinly veiled attempt to avoid liability for the Defendants' decision to push DiGiovanni and others back into the cafeteria." (Pl.'s Opp'n Br. Summ. J. 10.) In fleshing out this argument, he suggests that Pascucci's sworn statement contains misrepresentations. But the Court is hard pressed to reconcile his suggestion that Pascucci's account is flawed with the surveillance footage, in which officers can be heard shouting from the direction of the sally port. And there is DiGiovanni's own account, whereby he notes that officers ordered him back into the mess hall, which indicates that prison officials were present near the sally port that morning and actively taking measures to stop and control the fight.

The video of the incident shows that the fight was brief and that the two inmates appeared to be under control prior to the point where Manoil punched DiGiovanni. Once it became apparent that Manoil and Berardi were listening to officer commands, Captain Pascucci's decision to order the two of them to exit through the sally port themselves instead of sending a response team of officers into the mess hall (Pascucci Decl. ¶ 17), is consistent with the need to "preserve internal order and discipline and to maintain institutional security," Bell, 441 U.S. at 547, and is entitled to this Court's deference. And on the question of the reasonableness of the decision to send the inmates bunched at the sally port back into the mess hall when the fight was taking place, the need for officers to protect prisoners must be balanced against the need for officers to protect themselves. Captain Pascucci explained:

> The inmates in the modular sally port could not be released in the Tie Too area to go back to their housing units because a) no officer would have been available to escort those inmates back to their housing units as they were

10

> responding to the riot bell, and b) the officers were gathering in that area, in response to the riot bell and were preparing to enter the mess hall in the event the officers' intervention was necessary.

(Pascucci Decl. ¶ 16.)  The Court notes as well that Captain Pascucci was following EJSP emergency procedures, which require a squad of 12 officers to be assembled when entering an area with prisoners.  The Court cannot second-guess a decision that the record shows was reasonable and that adhered to the emergency procedures of the institution, which purport to strike the balance between the need for inmate safety and the need for officer safety.

A prison official does not violate the Eighth Amendment where s/he responded reasonably to a substantial risk of serious harm to an inmate, even if the harm ultimately was not averted.  <u>Farmer</u>, 511 U.S. at 844.  Here, in fact, the facts do not necessarily support a finding that DiGiovanni was necessarily placed at substantial risk of harm.  DiGiovanni cannot succeed on a § 1983 claim just because defendants Pascucci, Meyer, and Ventura did not respond to the fight the way he thinks they should have.  His characterization of that morning's events as deliberate indifference on the part of EJSP prison officials is unsupported, and in fact refuted, by the record, particularly the surveillance footage of the incident.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).  The surveillance footage, supported by Captain Pascucci's account, demonstrates that prison officials responded reasonably to the altercation, and that there is no genuine issue for trial.  Defendants' motion for summary judgment with respect to Count One is granted.

### C. Deliberate Indifference to Medical Needs

Count Two of the Amended Complaint seeks § 1983 damages against Nurse Baldassano, SCO Mikulak, and several unnamed CMS employees based on the allegation that they were deliberately indifferent to DiGiovanni's medical needs during the course of treatment for his injuries.  Defendants move for summary judgment on Count Two, arguing that as a matter of law "[m]ere negligent medical diagnosis, incorrect treatment, and other circumstances that amount to nothing more than medical malpractice will not suffice to state a claim upon which relief can be granted under 42 U.S.C. § 1983."  (Def.'s Summ. J. Br. 9, docket entry # 74.)

In Estelle v. Gamble, 429 U.S. 97, 103-04 (1976), the Supreme Court established that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Deliberate indifference is defined as "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05.  Mere negligent medical diagnosis, incorrect treatment, and other circumstances that constitute medical malpractice do not violate the Eighth Amendment. Id. at 106-07.  Liability under § 1983 cannot arise out of professional judgment exercised by prison medical staff during the treatment of an inmate unless those decisions amount to deliberate indifference. Id. at 106-07; see also Farmer v. Brennan, 511 U.S. 825, 835 (1994).

With respect to Nurse Baldassano and CMS, DiGiovanni's deliberate indifference claim fails as a matter of law.  The record demonstrates that the care he received was immediate and continuous.  He was taken to the medical unit for an evaluation approximately ten minutes after Manoil punched him.  His medical files detail a course of

12

treatment over two months that included x-rays, several prescriptions for medication and a special diet, and multiple evaluations by several doctors and nurses. (Ex. H to Johnson Decl. EMR1-EMR62.) DiGiovanni argues that Nurse Baldassano "is the face of indifference in this case," because "when she noted no teeth were broken, she didn't even realize his teeth were actually dentures." (Pl.'s Opp'n Br. Summ. J. 12.) These facts might constitute negligence, but not the intentional denial or delay of access to medical care.

DiGiovanni bases his claim against CMS on what he paints as an official CMS policy exemplified by the course of treatment he received. Even if the Court ignores the long-recognized principle that *respondeat superior* is not an acceptable basis for liability under § 1983, Polk County v. Dodson, 454 U.S. 312, 325 (1981), DiGiovanni posits no evidence to support this theory other than the course of treatment he received. His individualized experience with CMS falls far short of establishing that CMS has an official policy of deliberate indifference.

DiGiovanni's claims against SCO Mikulak fail for different reasons. He contends that Mikulak "witnessed the trauma inflicted upon DiGiovanni and yet failed to take any steps to ensure that his treatment was appropriate after the trauma." The defendants counter this by citing to Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993), where the Third Circuit found that the district court properly dismissed deliberate indifference claims against prison officials because the inmate had been in the care of the prison's medical staff. Durmer noted that the defendant prison officials were not physicians, and they could not be considered deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Id. Here, DiGiovanni was in the care of the prison medical staff. Mikulak is a corrections

officer, not a physician, and under Durmer he cannot be held liable under § 1983. Once DiGiovanni was placed in the medical staff's care, Mikulak had no duty to ensure that DiGiovanni's treatment was appropriate.[2]

Count Two of the Amended Complaint, the deliberate indifference claims against Baldassano, Mikulak, and several unnamed CMS employees, fails as a matter of law. A corrections officer cannot be found liable under § 1983 when the inmate is in the care of medical personnel, and no deliberate indifference claim arises where there is insufficient evidence to show more than negligence. Defendants' motion for summary judgment on Count Two is granted.

### D. Failure to Adequately Train and Unconstitutional Implied Policy

Defendants move for summary judgment on Count Three of the Amended Complaint, which seeks damages against Brown and Ortiz for failing to adequately train and supervise correctional personnel, and Count Four, which seeks damages against Brown, Ortiz, and two unnamed CMS employees for an alleged implied policy of limiting inmate access to diagnostic tools. Defendants argue that the claims against Commissioner Brown, Administrator Ortiz, and CMS are barred as a matter of law because a § 1983 claim cannot be premised solely upon a theory of *respondeat superior*. (Def.'s Summ. J. Br. 27.)

It is well established that § 1983 liability cannot be based solely on *respondeat superior*.

> A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of

---

[2] The Ninth Circuit case cited by DiGiovanni, Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006), is not binding on this Court. Jett held that the defendant warden could be found liable for deliberate indifference where she knowingly failed to respond plaintiff inmate's letters complaining about medical treatment for a fractured thumb, even though the plaintiff inmate had been continuously under the care of medical staff. In light of the Third Circuit's determination in Durmer that prison officials are not deliberately indifferent where the inmate had been in the care of the prison's medical staff, the Court declines to follow the reasoning in Jett.

14

> *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode v. Dellarciprete, 845 F.2d 1195, 1207-1208 (3d Cir. 1988). And although the Supreme Court has determined that § 1983 liability arises where "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (U.S. 1978), the applicable standard vitiates the claims at issue here.

The Supreme Court set forth the standard for failure to train § 1983 liability in Canton v. Harris, 489 U.S. 378, 390 (1989), holding that "the duties assigned to specific officers or employees [or] the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." An example of a policy that meets this standard would be the failure of a municipality to train police officers to use the firearms they are required to carry. Id. at 390 n. 10. The obviousness standard established in Canton is not met here. DiGiovanni fails to articulate, and this Court's review of the record did not reveal, facts that indicate that the various defendants were not trained as correction officers or were not qualified to provide medical care. DiGiovanni attempts to fashion into probative evidence Commissioner Brown's statements that to his knowledge the DOC does not gather statistics on inmate violence, that he had no involvement in the care of the individual inmates, and that he has no independent recollection of protocols to protect inmates from injury caused by other inmates. (Pl.'s Opp'n Br. Summ. J. 11.) Those statements, however, do not go to the issue of whether the DOC adequately *trains* its officers or employs unqualified medical

personnel. Absent more specific proof that demonstrates an actual failure to train, Count Three must fail.

DiGiovanni also argues that his deliberate indifference claim against Ortiz is not grounded in *respondeat superior* because he met with Ortiz, and this qualifies as personal involvement under Rode. But the ruling in Durmer forecloses this theory of liability. Administrator Ortiz is not a physician and cannot be held liable where DiGiovanni was under the care of medical professionals.

The insufficiency of DiGiovanni's unconstitutional policy claim is evident from the arguments in his opposition brief. After representing that Baldassano sent him back to his cell "at least three times without a referral to a doctor or a referral for an x-ray," he states: "Whether or not Baldassano acted under an express or implied policy allowing a front line nurse to refuse a referral to a physician in the face of serious trauma and complaints of facial pain is a question of fact, best left to a jury." (Pl.'s Opp'n Br. Summ. J. 12.) He goes on to argue that an absence of competent proof can be cured by going to trial and arguing to the jury that Nurse Baldassano "so clearly violated Plaintiff's rights to a simple diagnostic test" as to "suggest a de facto policy on the part of CMS." (Pl.'s Opp'n Br. Summ. J. 12.) If the jury rejects the suggestion, DiGiovanni argues, a directed verdict can be entered.

This is flawed reasoning. DiGiovanni has failed to show a *practice* existed of denying injured inmates diagnostic measures like x-rays. He only offers his unsupported interpretation of his course of treatment, which may support a negligence claim, but does not reach deliberate indifference or establish a practice. DiGiovanni's efforts during discovery yielded no evidence of a practice, and the defendants should not be held accountable for a "policy" unsupported by the record, and be made to stand trial on such an

16

unsupported claim, hoping that the jury rejects *arguments about* as opposed to *evidence of* a practice.  The case DiGiovanni relies on, Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 (3d Cir. 2003), makes precisely this point – there one of the nurses testified that a policy existed.

DiGiovanni bootstraps the above improper line of reasoning into "proof" of an unconstitutional policy by pointing to the absence of an official rebuke on his medical charts regarding Baldassano's alleged failures during his treatment.  (Pl.'s Opp'n Br. Summ. J. 11.)  But without evidentiary support beyond this circular reasoning, DiGiovanni cannot survive summary judgment on this claim.  The Court grants summary judgment on Count Four to the named defendants on that Count, Commissioner Brown, Administrator Ortiz, and CMS.  Counts Three and Four of the Amended Complaint, the deliberate indifference and unconstitutional implied policy claims against Brown, Ortiz, and CMS employees, fail as a matter of law.  Defendants' motion for summary judgment on Counts Three and Four is granted.

### E. State Law Claims

Count Five of the Amended Complaint sounds in negligence and is thus subject to New Jersey medical malpractice law.  See Chamberlain v. Giampapa, 210 F.3d 154, 157 (3d Cir. 2000).  This Court "may decline to exercise supplemental jurisdiction over a claim if . . . [it] has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Having dismissed DiGiovanni's federal claims, the Court declines to exercise supplemental jurisdiction over his medical malpractice claim and dismisses that claim without prejudice.

**F. Qualified Immunity and Failure to Exhaust**

The Court has determined that summary judgment should be granted on all counts, and so it is not necessary to address the defendants' arguments that certain defendants are entitled to qualified immunity and that DiGiovanni's complaint should be dismissed for failure to exhaust.

**V. CONCLUSION**

Based on the forgoing, defendants' motion for summary judgment is **granted** on all counts.  In addition, Correctional Medical Services' cross-claims for contribution and indemnification against Captain Pascucci, Sgt. Meyer, SCO Ventura, Nurse Baldassano, SCO Mikulak, and the unnamed CMS employees are dismissed as moot.  An appropriate order will be entered.


Dated:  March 31, 2008                                          /s/ Katharine S. Hayden

                                                                Katharine S. Hayden, U.S.D.J.